**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| FYFE CO., LLC, *et al.*, | * | |
| | * | |
| | * | |
| v. | * | Civil No. CCB-13-176 |
| | * | |
| | * | |
| STRUCTURAL GROUP, INC., *et al.* | * | |
| | * | |

********

# MEMORANDUM

Plaintiffs Fyfe Co., LLC ("Fyfe"), Fibrwrap Construction Services, Inc., and Fibrwrap Construction Services USA, Inc. ("Fibrwrap"), bring this lawsuit against defendant Structural Group, Inc. ("Structural"), and individual defendants Jason Alexander, Mark Geraghty, Anna Pridmore, and Shaun Loeding. They assert various tort and breach of contract claims relating to the individual defendants' resignation from Fyfe or its affiliated companies. Now pending are plaintiffs' motion for partial summary judgment (ECF No. 173), and defendants' motion for summary judgment, or in the alternative, partial summary judgment. (ECF No. 182).[1]

The motions are fully briefed, and no oral argument is necessary. *See* Local R. 105.6. For the reasons set forth below, plaintiffs' motion will be denied in part and denied in part

---

[1] Defendants also move to strike two exhibits submitted by plaintiffs in support of their motion for summary judgment. (ECF No. 177). Because the court did not rely on this evidence in reaching its decision, it need not address defendants' motion to strike at this time, and it will be denied without prejudice. Defendants may reassert their arguments that the declarations (or portions thereof) are inadmissible at a later date, if appropriate. Finally, with regard to Structural's motion for reconsideration, in which it asks the court to reconsider the Magistrate Judge's order denying its motion to compel discovery responses, that motion will not be granted. (ECF No. 166). To the extent the motion is an objection to the Magistrate Judge's order under Local Rule 301.5(a), it will be denied as untimely because it was not filed within 14 days of the order. Also, to the extent that the motion seeks to compel discovery, it will be denied as not in compliance with Local Rule 104.7. Plaintiffs' corresponding motion for leave to file a sur-reply (ECF No. 171) also will be denied.

without prejudice, and defendants' motion will be granted in part, denied in part, and denied in part without prejudice.

## BACKGROUND

Fyfe manufactures products used in construction strengthening systems for the repair and restoration of buildings; the Fibrwrap plaintiffs specialize in concrete repairs as well as the installation and construction of construction strengthening system products. All plaintiffs are incorporated in Delaware and headquartered in Missouri. (ECF No 175, Ex. 2, ¶¶ 2-12). Defendant Structural, allegedly a direct competitor of plaintiffs, is a specialty construction, repair, and maintenance services company incorporated and headquartered in Maryland. (ECF No. 67, ¶ 27; ECF No. 127, ¶ 27).

Until December 2012, each individual defendant worked for Fyfe or its affiliated companies. (ECF No. 67, ¶ 64; ECF No. 127, ¶ 64). Alexander, Geraghty, and Pridmore are all residents of California, and Loeding is a resident of New York. As part of their employment contracts, Geraghty, Pridmore, and Loeding (Vice President of Sales and Marketing for Fibrwrap, Vice President of Pipelines for Fyfe, and Vice President of Engineering for Fibrwrap, respectively) agreed not to use Fyfe or its parent companies' confidential information and trade secrets for his or her own personal benefit or that of a third party. (ECF No. 1, Ex. 3; ECF No. 1, Ex. 4; ECF No. 1, Ex. 5). In addition, they agreed not to "directly or indirectly participate in the recruitment, solicitation or hiring" of any employee of Fyfe or its parent companies by any other person or entity. (ECF No. 1, Ex. 3, p. 3; ECF No. 1, Ex. 4, p. 3; ECF No. 1, Ex. 5, p. 2). Likewise, Alexander, who held the position of Vice President of both Fyfe and Fibrwrap, signed an Executive Employment Agreement, which prohibited him from using confidential

2

information for anyone other than Fyfe, from engaging in business that competed against Fyfe, and from soliciting its employees to leave their employment.  (ECF No. 175, Ex. 11).

      The individual defendants announced their resignations from Fyfe or its parent companies on December 13, 2012—Alexander and Loeding gave December 28, 2012, as their last day of employment, and Pridmore and Geraghty gave December 31, 2012, as their last day. (ECF No. 127, ¶ 64; ECF No. 175, Ex. 6, p. 3).  Each began his or her new position at Structural the following month.  (*Id.*).  Plaintiffs allege that, during this time, each individual defendant solicited the others to defect from Fyfe and its affiliated companies and accept employment at Structural.  (*See* ECF No. 67).  Plaintiffs also allege that, before leaving plaintiffs' employ, the individual defendants destroyed plaintiffs' files; improperly communicated with Structural; improperly bid on projects without disclosing a conflict of interest; and used plaintiffs' confidential information and trade secrets at Structural to compete with plaintiffs.  (*See id.*).

      Plaintiffs filed their first complaint on January 16, 2013, seeking damages and other relief for these alleged acts.  (ECF No. 1).  They filed an amended complaint on January 22, 2013 (ECF No. 13), and after the court granted the individual defendants' motion to dismiss, the plaintiffs filed a second amended complaint on August 5, 2013.  (ECF No. 67).  Two subsequent motions to dismiss were denied.  (ECF No. 125).  Ten claims now remain against the defendants, either individually or jointly: breach of contract (Counts I and V); breaches of fiduciary duty and the duty of loyalty (Counts II and IV); misappropriation of trade secrets (Count III); unfair business practices (Count VII); aiding and abetting (Count VIII); tortious interference with contractual relations (Count IX); civil conspiracy (Count X); and preliminary and permanent injunctive relief (Count XI).

In their motion, plaintiffs assert they are entitled to summary judgment in their favor on Counts II and IV, and parts of Counts I and IX. (ECF No. 173). Defendants move for summary judgment on all claims. (ECF No. 182).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48.

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 2003)). The critical question is whether a reasonable fact finder could return a verdict for the non-moving party, or whether the movant would, at trial, be entitled to judgment as a matter of law. *See Anderson*, 477 U.S. 242; *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir. 1991).

Finally, when reviewing cross-motions for summary judgment, as in this case, the court must "review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540 U.S. 822 (2003) (internal citation and quotation marks omitted). "The court must deny both motions if it finds there is a genuine issue of material fact, [b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." *Thomas v. Artino*, 723 F. Supp.2d 822, 829 (D. Md. 2010) (internal quotation marks omitted) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1983)).

## ANALYSIS

Between the parties' respective motions for summary judgment, each of the ten counts remaining in the second amended complaint is at issue. To more efficiently address the parties' arguments, this opinion is organized by type of claim rather than by count. For the reasons that follow, plaintiffs' motion for summary judgment will be denied in part without prejudice (as to the Count II and IV claims for breach of fiduciary duty and breach of duty of loyalty), and denied in part (as to all remaining claims). Defendants' cross-motion for summary judgment will be granted in part (as to the portions of Counts I and IX arising from Alexander's alleged breach of the non-compete, and Count III in its entirety), denied in part without prejudice (as to portions of Counts I and V arising from the alleged misuse of confidential information, as well as the Count II and IV claims for breach of fiduciary duty and breach of duty of loyalty), and denied in part (as to all remaining claims).

I. **Breach of Contract Claims**

   A. **Under California Law, the Covenant Not to Compete in Alexander's EEA is Unenforceable.**

Plaintiffs first seek summary judgment on the portion of Count I alleging that Alexander breached the non-competition clause in his Executive Employment Agreement ("EEA"), as well as the portion of Count IX alleging that Structural tortiously interfered with Alexander's non-compete. (ECF No. 174, Ex. 1, pp. 23-37; 40-44). For their part, defendants assert that they are entitled to summary judgment on these claims because the non-compete in Alexander's EEA is unenforceable. (ECF No. 183, pp. 16-27). Defendants' argument prevails.

The outcome of this issue turns on whether Delaware law applies to Alexander's covenant not to compete—that is, whether the Delaware choice-of-law provision in the EEA governs the interpretation and enforcement of the non-compete. (*See* ECF No. 175, Ex. 11, § 9) (Alexander's EEA stating that "the validity, interpretation, construction, and performance of this Agreement shall be governed by the laws of the State of Delaware, without regard to its conflicts of laws principles."). It is well-established that a federal court in diversity jurisdiction applies the choice-of-law rules of the forum state. *See Three M Enterprises, Inc. v. Texas D.A.R. Enterprises, Inc.*, 368 F. Supp. 2d 450, 457 (D. Md. 2005). In Maryland, it is "generally accepted that the parties to a contract may agree as to the law which will govern their transaction." *Kronovet v. Lipchin*, 415 A.2d 1096, 1104 (Md. 1980). Maryland follows Section 187 of the Restatement (Second) of Conflict of Laws, however, which sets forth limitations on parties' choice of law. Restatement § 187(2) provides that the law of the chosen state will be applied unless either:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the

>determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Id*. at 1105 (quoting *Restatement (Second) of Conflict of Laws* § 187(2)(a)-(b) (1971)); *see also Nat'l Glass, Inc. v. J.C. Penney Properties, Inc.*, 650 A.2d 246, 249 (1994).

The parties in this case do not dispute that under Restatement § 187(2)(a), Delaware does indeed have a "substantial relationship to the parties or the transaction." Nor do the parties dispute that under § 187(2)(b), California would be "the state of applicable law" absent the choice of law provision in the EEA, and that enforcement of the non-compete would be contrary to California's fundamental public policy. *See* Cal. Bus. & Prof. § 16600 (West 2002) ("every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void," subject to statutory exceptions not relevant here); *see also Edwards v. Arthur Andersen LLP*, 189 P.3d 285, 290 (Cal. 2008) ("[t]oday in California, covenants not to compete are void, subject to several exceptions"). Accordingly, whether to enforce the choice-of-law provision in Alexander's EEA hinges on whether, under Restatement § 187(2)(b), California has a "materially greater interest" than Delaware in the enforceability of Alexander's covenant not to compete.

A review of the record shows that California does indeed have a materially greater interest in this issue than Delaware. In determining whether a state has a greater or lesser interest in a particular contract issue, Maryland courts typically consider the substance and degree of contacts that the parties have with the state, as well as whether the party asserting protection under that state's fundamental public policy is the type of person or entity the public policy was intended to protect. *See, e.g.*, *Three M Enterprises*, 368 F. Supp. 2d at 459; *Nat'l Glass*, 650 A.2d at 251. Here, Delaware's singular connection to this dispute is the fact that Fyfe is incorporated there. (ECF No 175, Ex. 2, ¶ 2). Fyfe's global headquarters are in California, and

7

its principal place of business is in Missouri.  (ECF No. 184, Ex. 42, ¶ ¶ 1-3; *id*. ¶ 2).  Moreover, although Alexander routinely travelled throughout the country in the course of his work for Fyfe (ECF No. 175, Ex. 8), he never travelled to Delaware on behalf of Fyfe, and Fyfe has no offices or physical presence in that state.  (ECF No. 184, Ex. 42, ¶ ¶ 1-3; ECF No. 184, Ex. 88, ¶ 5).

By contrast, California's connections to the dispute are substantial.  Throughout the time at issue, Alexander has resided and worked in California (ECF No. 184, Ex. 88, ¶ 2); indeed, all the evidence shows that Alexander's employment for Fyfe was based in California, and he negotiated and signed his EEA in his home state.  (ECF No. 184, Ex. 88, ¶ 3; ECF No. 175, Ex. 8; ECF No. 184, Ex. 14, ¶ 2).  Furthermore, although he travelled on behalf of his employer, Alexander worked in California—the location of Fyfe's global headquarters—a significant majority of the time.  (ECF No. 175, Ex. 8).  Indeed, as a lifelong resident of California, whose employment was based in that state, and who worked predominantly within that state, Alexander is manifestly the type of person protected by California's rule against covenants not to compete.  *See Edwards*, 189 P.3d at 291 ("our courts have consistently affirmed that section 16600 evinces a settled legislative policy in favor of open competition and employee mobility . . . [t]he law protects Californians and ensures that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice.") (internal quotation marks and citation omitted).  For these reasons, it is evident that California has a materially greater interest in the enforceability of Alexander's non-compete than Delaware.

That Delaware statutory law, like the law of many states, favors enforcement of choice-of-law provisions does not change this outcome.  Plaintiffs argue that because the Delaware Code "establishes a strong Delaware public policy favoring the enforcement of Delaware choice of law provisions," that state must have a materially greater interest in this dispute than

8

California. (ECF No. 190, p. 9-10); *see* 6 Del. Code Ann. § 2708 (providing that the choice of Delaware in a contract "shall conclusively be presumed to be a significant, material and reasonable relationship with this State."). This argument is unpersuasive for several reasons. First, the parties do not dispute that under the first prong of the Restatement test, Delaware has a substantial relationship to the parties; instead, they dispute which state, under the second prong of the test, has a materially greater interest in whether Alexander's EEA is enforced. And as defendants point out, that analysis does not turn on which state has a relatively greater fundamental public policy interest at issue, but rather on the strength of each state's overall connections to the dispute. *Restatement (Second) of Conflict of Laws* § 187(2)(b) (1971) (providing that the law of the chosen state will be applied unless its application "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue"); *see Three M Enterprises*, 368 F. Supp. at 459 (considering the nature and substance of the parties' connections to the states at issue in order to determine, under Restatement § 187(2)(b), which state has a materially greater interest); *Nat'l Glass*, 650 A.2d at 251 (same). As discussed above, the facts show that California has substantially more connections to this dispute than Delaware, whose sole connection to the dispute is that it is the state of Fyfe's incorporation.

Second, even if the relative strength of the states' public policies were the gravamen of the Restatement test, plaintiffs' argument that Delaware's public policy interest necessarily outweighs that of California likely would fail. California statutory law undisputedly establishes a specific interest in protecting people like Alexander, California residents employed within that state, from restrictions on their ability to seek employment of their choice. Cal. Bus. & Prof. Code § 16600. By contrast, the Delaware statutory provision on which plaintiffs rely simply

establishes a broad interest in freedom of contract. 6 Del. C. § 2708. Although certainly significant, such a general interest likely would not be enough to trump California's discrete interest in protecting the rights of its citizens to pursue "any lawful employment," *Edwards*, 189 P.3d at 291—particularly here, where it is clear that the non-compete is void under California law, and that California has substantially more connections to the parties involved.[2]

In sum, given California's substantial connections the parties, as well as its clear public policy protecting individuals like Alexander, California has a materially greater interest in the enforceability of Alexander's non-compete than Delaware. Although Fyfe is incorporated in Delaware, that sole link is significantly outweighed by the California's numerous connections to the parties: California is the state where Fyfe is headquartered, where Alexander resided and entered into the contract, and where his work for Fyfe was predominantly performed. Accordingly, the non-compete is unenforceable under California law, and summary judgment will be granted in Alexander's favor on the portions of Counts I and IX arising out of his alleged breach of that covenant.

  **B.** **A Question of Material Fact Exists Regarding Whether the Individual Defendants Breached the Non-Solicitation Obligations in Their Employment Agreements.**

---

[2] Moreover, as defendants note, it is tautological to suggest that under the Restatement test, Delaware's general public policy favoring freedom of contract necessarily trumps the interest of a default state with a public policy against non-competes. The purpose of the Restatement test is to "prevent parties from contracting around the law of the default state by importing the law of a more contractarian state, unless that second state also has a compelling interest in enforcement." *Ascension Ins. Holdings, LLC v. Underwood*, No. CV 9897-VCG, 2015 WL 356002, at *5 (Del. Ch. Jan. 28, 2015) (unpublished opinions are cited not as precedent but for the soundness of their reasoning). Accordingly, in every case in which one party seeks to avoid the application of the default state's law to a contract, "the state whose law was chosen" will necessarily have "the interest of protecting freedom to contract." *Id*. In other words, if the general interest of the chosen state (here, Delaware) automatically defeated the more specific public policy interest of the default state (California), the Restatement test would have no meaning, and the default state "would lose its ability to constrain pernicious enforcement of contract rights." *Id*.

Plaintiffs also move for summary judgment on their claims that Alexander breached the employee non-solicitation covenant in his EEA (another portion of Count I), and that Structural tortiously interfered with that covenant (a portion of Count IX). For their part, defendants seek summary judgment on *all* claims arising out of allegations that they recruited or solicited each other to leave plaintiffs' employ and accept employment with Structural. Thus implicated by these arguments are portions of: the Count I breach of contract claim against Alexander, the Count V breach of contract claim against the individual defendants, the breach of fiduciary and loyalty claims in Counts II and IV, and the tortious interference claim in Count IX. (ECF No. 67; ¶¶ 90, 96, 112-113, 118, 138). Because genuine issues of material fact exist as to whether any of the individual defendants wrongfully solicited each other, summary judgment will be denied as to claims based on these allegations.

Where, as here, an agreement prohibits an employee from "soliciting" co-workers without defining the term "solicit," courts typically defer to the common meaning of the term as defined in dictionaries. *See, e.g.*, *Meyer-Chatfield v. Century Bus. Servicing, Inc.*, 732 F. Supp. 2d 514, 520 (E.D. Pa. 2010); *Total Care Physicians, P.A. v. O'Hara*, No. 99C-11-201, 2002 WL 31667901, at *8 (Del. Super. Oct. 29, 2002) (citing *Aetna Bldg. Maint. Co. v. West*, 246 P.2d 11, 15 (Cal. 1952) (en banc)). Black's Law Dictionary defines "solicitation" as "[t]he act or an instance of requesting or seeking to obtain something; a request or petition." *Solicitation*, *Black's Law Dictionary* (10th ed. 2014). Merriam-Webster defines "solicit" as "to make petition to; to approach with a request or plea; to urge (as one's cause) strongly; to try to obtain by usually urgent requests or pleas." *Solicitation*, *Merriam-Webster Dictionary*, available at http://www.merriam-webster.com/dictionary/solicit (last visited Aug. 2, 2016). Courts that have considered claims of employee solicitation generally focus on factors such as: who initiated the

11

contact, whether the actions allegedly constituting solicitation were proactive or responsive, and whether the alleged solicitation involved active persuasion. *See, e.g.*, *KPMG Peat Marwick LLP v. Fernandez*, 709 A.2d 1160, 1163 (Del. Ch. 1998); *see also Wolverine Proctor & Schwartz, Inc. v. Aeroglide Corp.*, 402 F. Supp. 2d 365, 371 (D. Mass. 2005); *Aetna*, 246 P.2d at 15; *Inland Am. Winston Hotels, Inc. v. Crockett*, 712 S.E.2d 366, 370 (N.C. Ct. App. 2011).

In this case, the evidence as to whether the individual defendants engaged in such actions is conflicting. As to the allegations against Alexander, there is evidence that Pridmore, Loeding, and Geraghty first learned about the possibility of employment at Structural from Alexander (ECF No. 175, Ex. 15, p. 293; ECF No. 175, Ex. 10, p. 221-23; ECF 184, Ex. 6, p. 31-32); that Alexander scheduled their interviews at Structural (ECF No. 175, Ex. 6, pp. 120-24; ECF No. 175, Ex. 25, pp. 4-6); and that Alexander coordinated the delivery of offer letters from Structural to the individual defendants. (ECF No. 175, Ex. 25, pp. 4-6). Plaintiffs argue that such actions "were obviously intended and had the effect of influencing the Individual Defendants to quit Plaintiffs' employ." (ECF No. 174, Ex. 1, p. 39).

Defendants cite other evidence, however, that could lead a reasonable jury to the opposite conclusion. Pridmore, Loeding, and Geraghty explain that each initiated his or her own conversation with Alexander about the possibility of new employment because they were dissatisfied in their work for plaintiffs. (ECF No. 184, Ex. 11, ¶ 5; ECF No. 175, Ex. 10, p. 221-24; ECF 184, Ex. 6, p. 31-32). Defendants also point out that Alexander explained he coordinated the individual defendants' interviews with Structural "simply to keep [scheduling] communication efficient" (ECF No. 184, Ex. 14, ¶ 7), and that defendants contended Alexander never encouraged or advised them to take jobs at Structural. (ECF No. 184, Ex. 11, ¶ 7; ECF No. 184, Ex. 14, ¶ 6-8). While a reasonable jury could conclude, based on all of this evidence,

that Alexander's actions did constitute solicitation of the other defendants, a jury could likewise find that Alexander, acting responsively to inquiries from coworkers about other potential employment, did not breach any non-solicitation duties to plaintiffs. Accordingly, summary judgment on the solicitation claims against Alexander is inappropriate.

So, too, regarding plaintiffs' claims that the remaining individuals solicited each other. Defendants alone move for summary judgment on these claims, arguing that any evidence of the individual defendants soliciting each other amounts to mere "speculation." (ECF No. 183, p. 29-30). They point out that Pridmore, Loeding, and Geraghty each testified that they were dissatisfied with plaintiffs' employment and independently began inquiring about opportunities elsewhere (cited above), and note that Pridmore and Loeding stated that they made their own choice to leave Fyfe and begin working for Structural, uninfluenced by anyone else. (ECF No. 184, Ex. 11, ¶ 7; ECF No. 184, Ex. 16, ¶ 5). But such evidence does not compel the conclusion that a reasonable jury could find only in defendants' favor. For their part, plaintiffs provide circumstantial evidence that strongly suggests the individual defendants coordinated with each other regarding their employment negotiations with Structural, the timing of their resignation from Fyfe/Fibrwrap, and the timing of their commencement of work at Structural. (ECF No. 67; ¶ 64; ECF No. 127, ¶ 64). There is furthermore direct evidence of "significant communication" between the individual defendants before their resignation—via email and Skype chat—regarding the copying and deleting of files from their Fyfe computers, as well as using anti-forensics software to obfuscate evidence of such activity. (*See* ECF No. 175, Ex. 25, pp. 3-12). Viewing these facts in the light most favorable to plaintiffs, I find that a reasonable jury could infer that the individual defendants did urge or otherwise persuade each other to resign from plaintiffs' employ and accept work at Structural.

In sum, a genuine issue of material fact exists as to whether the individual defendants engaged in solicitation. Because such issues are properly resolved by a jury, summary judgment on claims arising from allegations of solicitation—that is, those portions of Counts I, II, IV, V, and IX—will be denied.

### C. Defendants are not Entitled to Summary Judgment on Plaintiffs' Contract Claims Based on Alleged Breaches of Confidentiality Obligations.

Defendants also move for summary judgment on breach of contract claims in Counts I and V arising from alleged misuse of confidential information. Defendants assert that these portions of the contract claims must fail because, even if the alleged misuse did constitute a breach, plaintiffs cannot show any damages resulting from it. (ECF No. 183, p. 41). It appears that there may be substantial disputes of fact regarding the alleged loss of business for which plaintiffs seek damages, although it is unclear at this stage what damages would be provable. Accordingly, summary judgment on all breach of contract claims in Counts I and V arising from alleged breaches of confidentiality obligations will be denied without prejudice.

## II. Breach of Fiduciary Duty Claims

Next, plaintiffs move for summary judgment on the Count II and IV claims for breach of fiduciary duty and breach of duty of loyalty. (ECF No. 174, Ex. 1, pp. 44-50). Defendants assert that they are entitled to summary judgment on the same claims. (ECF No. 183, pp. 30-40). In their briefing, the parties vigorously dispute whether the individual defendants wrongfully made arrangements to compete while still employed by plaintiffs. It is not clear, however, what damages can be connected to such conduct, and whether those damages are recoverable. Accordingly, the parties' respective motions for summary judgment as to these claims will be denied without prejudice.

**III.     Misappropriation of Trade Secrets Claim**

Finally, defendants move for summary judgment on plaintiffs' misappropriation of trade secrets claim (Count III). Count III alleges that defendants violated the California Uniform Trade Secrets Act ("CUTSA") and the Maryland Uniform Trade Secrets Act ("MUTSA") by improperly using plaintiffs' trade secrets to compete at Structural. (ECF No. 67, ¶ 104).[3] Statutory law defines a "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process" that "[d]erives independent economic value, actual or potential, from not being generally known to the public or other persons who can obtain economic value from its disclosure or use" and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d) (West 2012); *see also* Md. Code Ann., Com. Law § 11-1201(e) (West 2010). To prevail on a claim for misappropriation of trade secrets, a plaintiff must demonstrate: (1) the existence of a trade secret; (2) that the defendant acquired, disclosed, or used the trade secret through improper means; and (3) that the defendant's actions damaged the plaintiff. *KLA-Tencor Corp. v. Murphy*, 717 F. Supp. 2d 895, 906 (N.D. Cal. 2010).

In their motion, defendants assert they are entitled to summary judgment on this claim because plaintiffs did not adequately identify their purported trade secrets; defendants also contend that plaintiffs failed to raise an issue of triable fact as to the existence of any trade secret, or damages resulting from any alleged misappropriation thereof. (ECF No. 183, pp. 42-74).

---

[3] The parties agree that because both California and Maryland have adopted trade secret statutes that closely track the Uniform Trade Secrets Act, the analysis of plaintiffs' trade secrets claim is the same under the laws of both states. *See* Md. Code Ann., Com. Law § 11-1208 (West 2015) ("[MUTSA] shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this subtitle among states enacting it.").

It is axiomatic—and essential—that a plaintiff asserting a misappropriation of trade secrets claim identify their purported trade secrets with sufficient detail and precision. *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998) (the plaintiff bears the burden of "describ[ing] the subject matter of the trade secret with *sufficient particularity*") (internal quotation marks and citation omitted); *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 661 (4th Cir. 1993) (a plaintiff must identify, with particularity, each trade secret it claims defendant misappropriated). This requirement is necessary in order to allow a fact finder "to separate [the alleged trade secrets] from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in a trade." *Imax*, 152 F.3d at 1164-65 (internal quotation marks and citation omitted); *see also MicroStrategy Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 418 (E.D. Va. 2004) ("This must be done to allow the finder of fact to distinguish that which is legitimately a trade secret from other information that is simply confidential but not a trade secret, or is publicly available information.").

Here, in spreadsheet form, plaintiffs listed over 6,000 computer files that they assert contain either a trade secret or confidential information. (ECF No. 184, Ex. 26 and 27). Of the files listed, plaintiffs designated approximately 2,400 documents as trade secrets. (*Id.*). This lengthy list of file names falls short of identifying purported trade secrets with sufficient particularity. First, beyond the names and titles of the computer files, the spreadsheet contains no information detailing the trade secret information purportedly contained within them. *See Integral Dev. Corp. v. Tolat*, No. 12-06575, 2015 WL 674425, at *4 (N.D. Cal. Feb. 12, 2015) ("Listing hundreds of file names without identifying the trade secret information contained within the files, is insufficient."); *FormFactor v. Micro-Probe*, No. 10-3095, 2012 U.S. Dist. LEXIS 79359, *17-18 (N.D. Cal. June 7, 2012) (finding that list of 4,500 files did not

"sufficiently identif[y] the trade secrets with particularity, in part because of the very size of the lists, and in part because many of the entries consist of a mere listing of names of computer files."). And although a number of file names could be considered descriptive to the extent that they include words such as "proposal" or "budget" and the name of a current or prospective client, plaintiffs have proposed no way for this court to determine whether any of the files actually are in fact proposals or budgets containing trade secret information.

Moreover, a significant proportion of the file names do nothing to detail their contents in a meaningful way. A large number are entirely generic (e.g., they simply bear some permutation of the name "Proposal.doc" or "FibrwrapProposal.doc"); bear only the name of what appears to be a client or potential client (e.g., "196812_BeckGroup.doc"); or appear to represent sequential versions of the same document (e.g., "ProposalFibrwrap.v1.doc," "ProposalFibrwrap.v2.doc," "ProposalFibrwrap.v3.doc," etc.). (ECF No. 184, Ex. 26 and 27). Moreover, the spreadsheets offer no detailed information about actual file content other than indicating what title each document had. Many files do not have a title listed at all, and most of the titles that *are* listed are as nondescript or general as the file names themselves—i.e., they consist of only a date, merely restate the name of the file, or simply say "proposal." (*Id*.). The court is not persuaded by plaintiffs' argument that their identification is sufficient because the spreadsheets also listed "file type . . . created and modified dates, and unique MD5 hash number." (ECF No. 190, p. 40). As defendants point out, knowing information such as when a file was created or whether that file is a Word or PDF document does little by way of identifying what information within the file is a protectable trade secret. Although it may be that such information "allowed Defendants to definitely identify and obtain all such documents from the computers and devices taken by the

Individuals" (*id.*), it does not aid in the court's determination of whether each file does indeed contain protectable trade secrets, let alone details about them.

Indeed, the extent of plaintiffs' familiarity with the *contents* of these files—and thus, the trade secret information they may or may not contain—cannot be determined from the current record. According to plaintiffs, their methodology for determining which files contained trade secrets consisted of "designat[ing] as trade secrets all files listed [on the spreadsheets] . . . which contain the words 'submittal,' 'budget,' 'proposal,' 'hot list,' 'test,' 'testing,' 'PUD,' 'marketing[,]' 'presentation[,]' or 'list,'" as well as any file name containing "the name of a client or customer of Plaintiffs" or "the name of a specific project" on which any of the individual defendants worked. (ECF No. 184, Ex. 25, p. 5). And although plaintiffs assert that they "made a good faith effort to individually review" the 200,000 Fyfe/Fibrwrap documents they allege defendants misappropriated from plaintiffs (ECF No. 190, Ex. 52, p. 5), the record does not show which of the 2,400 files they have designated as trade secrets they have reviewed—let alone whether they actually examined those files before designating them as trade secrets.

Moreover, to the extent that plaintiffs now claim in their opposition brief that they did in fact individually review each document before designating it as a trade secret (ECF No. 190, pp. 33-34), that assertion is simply not supported by the evidence. When asked the process by which plaintiffs designated files as trade secrets, plaintiffs' witness Tod O'Donoghue responded that plaintiffs first "generally define[d] trade secrets. . . in responses to interrogatories," and then, based on a report of all the documents the individual defendants took with them to Structural, "had Huron Consulting do a word search – for example, using search terms such as proposals, budgets, PUD lists, et cetera to prepare a list [of trade secrets], and plaintiffs acknowledge that

we probably overlooked some documents." (ECF No. 195, Ex. 44, pp. 311-12). When asked whether plaintiffs looked at each file that came up in the keyword search before designating it as a trade secret, O'Donoghue testified that although he did not know "the exact process that was done for each [file]" it was "[his] understanding that it was done more with word searches. Nobody would have the time to look at every single document." (ECF No. 195, Ex. 44, pp. 312-13). Finally, O'Donoghue testified that "some documents were randomly looked at in total but not all of them," and he declined to quantify or even estimate how many documents plaintiffs actually reviewed. (*Id*. at 313).

It may well be that some of the files designated by plaintiffs do indeed contain trade secrets entitled to protection. But on this record, the court cannot make that determination—let alone whether such information was misappropriated, or whether plaintiffs suffered damages as a result. Accordingly, defendants' motion for summary judgment on the misappropriation of trade secrets claim will be granted.

**IV.    Derivative Claims**

Finally, defendants make the cursory argument that they are entitled to summary judgment on plaintiffs' derivative claims—Unfair Business Practices (Count VII), Aiding and Abetting (Count VII), Civil Conspiracy (Count X), and Preliminary and Permanent Injunctive Relief (Count XI). As both parties acknowledge, these derivative claims rise and fall with the other causes of action. (ECF No. 182, p. 74; ECF No. 190, pp. 49-50). Accordingly, they survive summary judgment to the extent the claims on which they depend survive.

## CONCLUSION

For the reasons stated above, plaintiffs' motion for summary judgment will be denied in part, and denied in part without prejudice; and defendants' motion for summary judgment will be

granted in part, denied in part, and denied in part without prejudice.  Defendants' motion to strike will be denied without prejudice and resolved at or closer to the date of trial.

     A separate Order follows.


September 7, 2016                                                    /S/
       Date                                                           Catherine C. Blake
                                                                     United States District Judge